Council, welcome. The way we will proceed this morning, the panel as you know is Judge Newman, Judge Lynch, and I'm the third judge on this panel. We'll proceed hearing argument first on behalf of Mr. Donohue. And I think what we'd like to do is give you a couple of minutes, probably two or three, before we begin questioning. That's with respect to the first argument. And then we three judges will, when we have questions, we will chime in, tell you who it is asking the question and addressing you and seeking responses from you. And we'll proceed in the order listed. I think we have that. But if counsel would each announce his or her, obviously, identify yourselves when you begin arguing on behalf of your appellant, that would be great. And for the State of New York Council, you'll get to respond after each of the other persons has had a chance to argue. And then I note that some of you have reserved rebuttal time, so that will follow on after that. So, Mr. Wilke? Yes, Judge. Good morning. Good morning. Eric Wilke, counsel at CSEA on behalf of the Donohue plaintiffs. Your Honor, the issue here is whether there's a vested right to continue health insurance in retirement at a fixed rate of premium under the collective bargaining agreements entered into between CSEA and the State of New York from 1983 until 2011. These collective bargaining agreements were entered into pursuant to the New York State Taylor Law. The New York State Taylor Law provides that health insurance benefits for current employees in retirement are mandatory subjects of negotiations because they are deferred as opposed to private sector agreements that would constitute ERISA welfare plans. So, the district court here did correctly determine that the collective bargaining agreements at issue should be interpreted by New York State law. The leading New York State case regarding this area of law is Colby v. Tibbetts. However, the district court only cited to Colby in one instance for the general proposition of general contract interpretation. So, what the court indicated was central to its analysis of whether there was an existence of a contract was under Tackett v. M&G Polymers. So, the provisions here for the Donohue plaintiffs are all under Article 9 of their collective bargaining agreements. Throughout the life of these agreements over a 30-year period, some of the specific clauses moved from one number to another, but the language itself remained the same. So, the contracts provide that employees covered by the state health insurance plan have the right to retain health insurance after retirement upon completion of 10 years of service. That same clause from 1991 until 2004 also included language that says, however, in recognition of the forthcoming changes to the government accounting standards for GASB requirements, both the state and CSCA recognize the need to address the inequity of providing employees who serve the minimum amount of time necessary for health insurance and retirement with the same benefits as career employees. Prior to the expiration of this contract, CSCA and the state shall, through the joint committee process, develop a proposal to modify the manner in which… Excuse me, Mr. Wilkie. This is Judge Lynch. Could you just slow down? I understand it's a just because it is very complicated and you're referring us to very specific language that you want us to pay close attention to. If you could just go a little bit slower when you read it, it would be helpful. Yes, your honor. So, that language goes on to say, prior to the expiration of this contract, CSCA and the state shall, through the joint committee process, develop a proposal to modify the manner in which employer contributions to retiree premiums are calculated. That language did remain in the collective bargaining agreement from 1991 until 2004 when it was removed at CSCA's request. So, the language in the contract also from 83 until 2000, actually until the 2011-2016 contract said, the state agrees to pay 90% of the cost of individual coverage and 75% of the cost of dependent coverage. Further, there is a clause that has remained in these contracts throughout these years that also provides for the unremarried spouse and otherwise eligible dependent children of an employee who retires after 1979 with 10 or more years of active state service who subsequently dies shall be permitted to continue coverage in the health insurance program with payment at the same contribution rate as required of active employees for the same coverage. Mr. Wilkie, this is Judge Lynch again. May I ask a question? You're focused here on the interpretation of the contract and putting aside for a moment the contract clause constitutional issue, you have a claim under state law for breach of contract. Is that correct? That is correct. Yes. And is it your position, I understand you can argue these two, even if the can argue them in the alternative and that's fine, but with respect to the contract clause claim, are you maintaining that under New York law, not only was there a breach of the contract, but that you have a remedy for that breach of contract in damages under state law? Yes. What we're saying is that there is a breach of the contract and the remedy that we would be seeking is that the increase of the contribution rates that the retirees have been paying. That's what we're saying here in our impairment cause of action. Well, but is that what you're saying on your breach cause of action? Just to make clear what I'm getting at, as I understand the law under the contract clause, a contract is only impaired if the state by legislation disavows or renders invalid the contract. If the contract remains valid and it has been breached and there is a remedy for the breach at state law, then there is no contract clause claim. Now I understand that you're arguing these things in the alternative and we might reach a variety of conclusions on the breach of contract claims. But I'm thinking about in what order should we take these things up? And if we should take up the breach of contract claim first, because normally we take up non-constitutional claims before we reach constitutional issues, wouldn't it clearly be a matter of reference to the New York Court of Appeals as to A, how this contract should be interpreted under state law because it's a state contract, at least for purposes of the breach of contract claim, regardless of the contract clause constitutional claim. And B, it would be a very important matter of state law whether the state's legislation should be interpreted as saying, well, we think we have a right to do this under the contract, so we're doing it without any disavowal of, without the legislature saying, and by the way, if a court thinks that we are wrong about the interpretation of the contract, we're still not going to pay because we're disavowing this contract and rendering it invalid by legislation in that event. In other words, what the state legislature meant to do, whether it was simply saying, we think we have a right under the contract to change these payments and we're doing so, subject to the possibility that the courts might decide that we've breached the contract and have to pay damages, or whether they are actually saying, the hell with this contract, it has to be changed because of the emergency. Aren't all of those questions of state law that the state's biased court should resolve rather than we? Yes, your honor. And that we actually, in the district court's analysis, they essentially just adopted the impairment claim analysis under Tackett rather than analyzing the state breach of contract cause of action under Colby versus Tibbetts. So yes, those are all questions for the under state law that should be addressed in that analysis. So yes, I would agree with that. And it should be certified to the New York Court of Appeals? I'm sorry, I'm sorry. And you would like it certified to the New York Court of Appeals? I would say that the New York Court of Appeals would certainly be the correct court to oversee this and make that analysis. I don't understand that. It's whether you want it to go there now that it's in front of us. I think that that would be appropriate. Okay, thank you. Now, Judge Newman, I'd like to pursue that point just a bit. You're here urging us to take action and your primary request is to reverse the decision of the district court. So I think it's of your client that you want us to resolve the state law question or you want us to refer the state law question by certification to the New York Court of Appeals. Which is your position? Well, our position initially was that this and what we wrote in our brief was that we thought that the district court got the state law breach of contract action wrong. That the district court did not analyze the state law breach of contract cause of action under Colby v. Tibbetts. So that was what we've argued in our brief. So in the alternative, I would say that a certification of that question to the New York Court of Appeals would be appropriate. Well, all right. So you've given us alternative and you've used the word appropriate. I think it's still fair to press you as to which is the preferred position of your client. So I think that, I mean, since this wasn't something, I mean, the court did take up supplemental jurisdiction and I get that. I guess what you're asking me is whether or not my clients would prefer if this were a certified question to the court of appeals or for you to and either remand it back to the district court to interpret New York state law or not. I would say that the court of appeals would probably be the appropriate. So, I mean, this court can determine if there's ambiguity and remand it to the district court for further proceedings. So it may further delay this nine-year proceeding, I suppose, if it were certified. That's the point. Litigants confronting these choices have to debate both which forum they think they'd rather be in on the state law question and they have to consider the delay issue. For some, it's a difficult choice. Perhaps you'd like to have a couple of days to position. Yes, actually, I would appreciate that, Judge. Is that all right, Judge Hall? Of course. Thank you. Mr. Wilkie? Yes, Judge. Anything else at this point? You have reserved two minutes for rebuttal. Well, I'll then save my two minutes for rebuttal, Your Honor. Thank you. Can I ask you a question which I hope will not come out of your rebuttal time? No, it certainly won't. On what you've tendered as the basic question, well, maybe I shouldn't even call it basic. A leading question is your view that the contract gives you a right to avoid having the benefits changed in any way because, never mind the durational issue of the CBA, you think the assurance of the contributory rate survives the expiration of the contract. Have I got that right? That is correct, Judge. We believe that it is a vested right that survives the termination of the contract. All right. So, in that connection, what I'd like to ask is, could the state increase the benefit of a retiree after the expiration of the CBA? I think that what the retiree is entitled to is what is delineated and specified in the contract. So, I think if they wanted to reduce the premium payment, so instead of paying that they're going to make it zero, I think that that would actually be contrary to the contract as well. You're saying the state couldn't give their employees a gift or bonus gratuitously? I thought what you're about to say was that they're entitled under the contract to what they were promised under the contract, but that would not make it invalid for the state to give them more as a gratuitous gesture of some kind. I don't think that it would be illegal for them to give them a greater benefit. It's just that benefit is not what's specified in the contract. May I ask just two other questions going to what your positions are? As you've argued this today, and as I think you argued it in your principle brief, your argument for entitlement rests on the pre-2011 collective bargaining agreements. Is that right? That is correct, from 1983 to 2011. So, you're not arguing that the 2011 CBA in itself in some way grants a right to the payment of No. No, we are not. The other question is one of the things that I think you are relying on here. Essentially, there are a couple of other things you've got, but one of the principal ones is that the retirees were guaranteed the right to continue or to retain insurance coverage. I'm trying to figure out what exactly that means. I take it you mean that one of the things that's included in coverage is the same kind of contribution payment that was guaranteed in the contract in effect at the time the employee retires? So, I don't know if that is necessarily explicit. It could be. It's certainly not explicit in the contract. I thought what you were saying was that this is one of the pieces of language from which you infer that. Right, and that's the reason why we're saying that certainly summary judgment on the part of the state was inappropriate. We move for summary judgment as well, based upon what we believed was clear contract language, but to the extent that it's certainly not silent, at most it's ambiguous, and the state certainly was not entitled to summary judgment on their motion. There are other changes in coverage, typically, in health insurance plans as time goes on. Sometimes, an insurance policy specifically covers certain kinds of screening, for example. You're going to get your prostate screening or we, the insurance company, like to see you get because it'll keep people healthy and lead to early detection, and in the long run, it'll cost us less. But then at some point, they decide, well, the prostate screening really isn't cost-effective, and we're not going to cover that anymore. Do you contend that anyone who retires is entitled to precisely what was in the policies? In effect, at the time each person retired, or at the time of the CBA under which they retired? No. The Donahue plaintiffs have not made that claim. I understand it's not a claim that's at issue in the case. I'm trying to understand the implications of a broad reading of the term coverage. I think that that is ambiguous at this point. That's a different question, and it's also one in which you think the contract is ambiguous. Correct. Okay. This is Judge Newman again. I'm not sure you've fully given us your argument, which is at the heart of the district court decision on the federal question, or at least the premise of the federal question, which is that in the absence of explicit durational language for some clause that gives the retirees lifetime benefits, you are stuck with the durational limits of the CBA itself, and that the retirees cannot complain about any change made beyond the life of the contract. Do you want to say what your argument is on that point? Yes, Judge. What we're saying here is that because of the language of the it's not silent. There is language in there regarding employer contributions when you read everything collectively, and so it's not silent. It's at most ambiguous, and so where it's ambiguous that the court should have reviewed extrinsic evidence. There's clauses covering those topics, but what language do you rely on to say those clauses survive the dates of the CBA? Well, you're talking about specifically whether or not there is durational language in those clauses? Anywhere in the contract. I want to know where in the contract do you find language that entitles your clients to benefit provisions that survive the CBA dates? Right. I don't have any language that says that it shall, what the court had looked at here was that where it says that employees covered by the state health insurance plan have the right to retain health insurance after retirement upon completion of 10 years of service. What the court said there was that that was a vested right, and that's what's a vested right. Then with respect to, again, this is with the impairment action, the state agrees to pay 90% of the cost of individual coverage and 75% of dependent coverage. There, the court said that that does not survive because it doesn't have specific durational language. So the way that we work, it's difficult to reconcile the district court's decision, and the way that we're looking at that is that it's ambiguous, and that the court should look to extrinsic evidence because they find that one clause that says after 10 years of service, you have retained health insurance after retirement. It doesn't say in that particular clause that forever, although what we are saying even with this impairment action is that you have to interpret whether or not there is a contract under New York state law. There are some decisions, including Colby, and then a recent decision as well in the third department appellate division that the courts were looking at whether or not the fact that the lack of voting rights for retirees gives a greater rise to ensure that if there are benefits there that they are protected. Thank you. You're welcome. So I will, unless there are further questions, I'll reserve my two minutes for rebuttal. Yes, you may do that. Thank you. Thank you, Mr. Wilkie. Mr. Green, are you up? Oh, yes. Good morning, your honors. My name is Edward J. Green, Jr. of counsel to Robert T. Riley, representing the plaintiff in the Cray matter. The Supreme Court's decision in Tackett and in Reese held that to survive summary judgment, a plaintiff must show express indicia in the agreement to the intent to confer benefits beyond the contract's durational clause. Plaintiffs here have provided such evidence below. Tackett further instructs that collective bargaining agreements are to be interpreted consistent with the applicable labor policy. In the case of Tackett, that was a private sector LMRA labor policy. In our case, that policy for a public sector contract in the state of New York is the Taylor law in cases from the New York courts that have interpreted the Taylor law and interpreted collective bargaining agreements. Start with the under which the plaintiffs retire to look for that authority to extend beyond the term. I note that the health insurance article, which is 39 in our agreement, at 1A unambiguously provides that the state will pay 90% of the cost of individual and 75% of the cost of distinction between active or retired employees. Paragraph 10F of that same article expresses and states that after 10 years of service, employees are entitled to receive health coverage after retirement. In paragraph 10G of that same article provides a lifetime benefit and uses the term lifetime, which is a sick leave credit to be applied against premiums. It further goes on and creates a right for retirees who obtain other coverage to leave the plan and to return to the plan indefinitely and allows those retirees to leave the plan and and reapply their lifetime credit for sick leave. It is precisely those references to lifetime benefits. Thank you. Indefinite benefits that the court in Colby, which Mr. Wilkie talked about at some length, found were significant in showing the parties intent that the collective bargaining agreement or the health benefits and that the provisions of the health benefit article should apply rather than the general durational limits of the collective bargaining agreement. Mr. Bean, could you just remind me which union you're here on behalf of and which collective bargaining agreement you're referring to? Yes, it's the university. It's the Cray matter, which is the university professors. It is. That's the CBA that you're specifically addressing. I just want to make sure I understood which contract I'm looking at. Thank you. Again, looking for in a joint appendix, the reference to these various benefits in article 39 can be found at joint appendix 592 for the 2007-11 collective bargaining agreements. And it extends beyond that. Jumping to some other relevant issues, regarding the constitutionality of this impairment, it's clear that the cost shift of hundreds of dollars to retirees subsisting on fixed incomes is substantial and that less deference should be applied to the impairment here because the state is impairing its own contracts in a self-serving fashion. This is a permanent cost shift to a powerless minority from whom these very concessions have been sought alongside collective bargaining. And this is a permanent taking and a drastic and overly severe rather than a temporary suspension of benefits, which has never been found constitutional. And the court's decision on these issues cannot be reconciled with the court's decisions in surrogates and Buffalo teachers, which took into serious consideration the limited duration of the impairments in those It cannot credibly be asserted that a lifetime impairment of these retirees' rights to address the fiscal crisis of 2011. It would be irrational to find that, and it is completely inconsistent with the court's analysis of impairments. And thank you. Thank you, Mr. Green. Thank you. Okay. We will now hear from Mr. Walsh. Good morning, Your Honors. Mark Walsh for the New York State Police Investigators Association. You know, all these cases are different. They have different records. In our case, Judge D'Agostino decided on the basis that while the CBAs all provided that retirees had the right to health insurance throughout retirement, they were all silent as to the premium contribution rate to be paid by those retirees. What she overlooked in making that determination in our case was that the state in this case admitted that the 1999 collective bargaining agreement was an existing agreement, this is a quote, an existing agreement as it pertained to the retiree health insurance premium contribution rate, 90-10, 75-25. So this is important because not only does it show that she made an error in that determination, but also because when considered in part as part of the state's other statement, that that 1999 collective bargaining agreement remained in effect until at least February of 2014, more than two years after the state took the legislative and administrative acts to disavow the contract. The defendants eventually acknowledged this at page 95 of their brief and then argued that the existence of the CBA does not establish vesting. However, vesting is not necessary for those employees who retired from 1999 until 2014, which is because they had the contract in place. So it did not need to be vested beyond that timeframe. But addressing the vesting question, or at least whether it's ambiguous, which is the question. Well, excuse me, Mr. Walsh, before getting to that, is what you just said something in the nature of a kind of fallback argument in the sense that I take it you were about to tell us that you agree with the positions taken by Mr. Wilkie and Mr. Green that there is vesting and what you're also saying is that even if we were to disagree with that, and even if that issue is decided against you, that your members at least are entitled to damages for the breach or disavowal or impairment of the contract that was still in place through 2014. Is that what you were just arguing? Yes, and I was about to get to the vesting, and I do believe that there is at least an ambiguity as to vesting. I understand that. I just want to make sure that I understand the separate argument that even if you lose everything else, which of course you don't want to lose and you have good arguments that you want to make about that, that there still is something distinctive about the timing of the contracts in your case that would entitle your members to something that is distinct from what happens to people who are subject to contracts that expired in 2011 and then there was a new contract in effect starting in April 2011 or thereabouts. Well, I don't want to make their case to distinguish that. All I'm saying is that for our members, from the 1999 collective bargaining agreement was as part of the state's case. Excuse me. You have one minute left. Oh boy. It was in effect as of 2014. Okay. But as to vesting, Tackett criticized the Yard Man rule, and it is distinguished because in New York it's deferred compensation as Mr. Wilkie noted. But Tackett was criticized Yard Man because the Sixth Circuit didn't have a record foundation for its assessment that the intentions, what the intentions of the employees and the employers in the union were. Here we have that, and we have that in the form of the testimony of, deposition testimony of the director and who has served in the governor's office of employee relations for 25 years. He testified that when shown a clause that was modifying, it was a proposal to modify terms of a collective bargaining agreement for retiree and premium contributions, didn't say whether it lasted into perpetuity. It didn't say it's sunset. And I asked him, why does he know that it lasted into perpetuity? He answered that it lasted into perpetuity. And he answered the state intended it because we didn't communicate a sunset clause. And so, and there's similar testimony from Priscilla Feinberg, who is the state governor's office of employee relations person in charge of health insurance. She had a similar testimony about when the state, about the same clause, that's the state's intent when it negotiates proposals such as that, that is that they last into perpetuity. So we have a process, we have evidence in this record that shows what the practice of these parties is, how they operate. And under this court's precedents and Curry Road and a bunch of other cases, the practice of the parties is relevant to whether there's an What we're saying is that we have produced the evidence that the Tackett court criticized Yard Man for not having. And all of this is consistent with New York law, because under New York law, the Triborough Doctrine extends contracts past what is the terminal date. Those contracts remain in full force and effect. And importantly, unions under the New York State Public Employment Relations Board precedent can stand on their status quo rights indefinitely. And that's really not very much different than what happened here where we have a 15, a contract lasting 15 years, although the original dates on the contract were 1999 until 2003. So we submit that that together with the governor's office task force on retiree health insurance, which states that the legal regime for retirement benefits in collective bargaining agreements is that those cannot be altered, except as set forth in such an agreement. So what we're saying is that these factors establish that there is at least an ambiguity here that should have led the court to not grant summary judgment to the state. Thank you, Mr. Walsh. Sorry, next is, excuse me, Mr. Riley. Good morning, your honors. This is Richard Riley on behalf of Appellant Police Benevolent Association of New York State. We will not but we do wish to highlight a few points that we think are particularly significant in the context of the state's motion for summary judgment, or of course, the state had the burden to establish a lack of material questions of fact, as noted by the attorneys who have spoken before me, there are effectively two clauses that are at issue in the various collective bargaining agreements, the continuation clause, and then the contribution clause, which describes the contribution rates to be paid for health insurance by the respective parties. We note that on its own motion, the defendants really did not assert or make any assertions concerning the contribution clauses and the fact that they supposedly do not apply to retirees. We believe that it was the state's burden to make this initial showing and that they have the burden to demonstrate on the record a lack of questions of fact concerning this issue. As Mr. Walsh had mentioned, the district court essentially seemed to conclude that the collective bargaining agreements guarantee health insurance, but they're silent as to the contribution rates. We note that both clauses essentially use the same language, they refer to employees, they do not refer to retirees or active employees, and that the continuation of health insurance really begs the question, at what cost? We also note that the district court's conclusion in this regard really is inconsistent with what appeared to be the state's position, which was that health insurance contribution rates were guaranteed in retirement, but only for the court below to have granted summary judgment on a theory that was not proffered by the moving party was itself a reversible error. Also, to follow up on Mr. Walsh's note that there are distinctions in the records for the various appeals, the PBA also had an agreement that was still in effect at the time the change was imposed by the state. They had not negotiated a new agreement in the 1999 to 2003 agreements remained in place. We would also note concerning the issue of reasonableness, the memorandum decision in order refers to undisputed facts in the CSEA record. Again, the PBA did challenge the reasonableness aspect of the state's action. Specifically, we refer to testimony by Mr. Bress, who noted that it was his recommendation that civil service law section 167 be revised, and that savings to the state budget was not a basis for his recommendation. There's also testimony from Mr. Bromby, who could not identify any review by the state of why the action was being taken over others, and Ms. Feinberg, who essentially testified that in every negotiation, the state takes the position that they're in a fiscal crisis. 2011 really wasn't any different than any of the others. I'd also just point to- This is Judge Lynch, Mr. Riley. Does the fact that they cry wolf all the time relieve us of the obligation to ask whether there really was a wolf at the door in this time period? In other words, isn't that an objective question as to whether there was an emergency? Well, I think it's indicative of the fact that they really haven't met the burden in this case by demonstrating any true analysis of what the alternatives might have been to taking this particular action. I would also note that there's other questions. The state had an operating surplus of $1.5 billion. It did not tap into its reserves. It actually increased its contributions to what it called its rainy day fund by between $100 and $275 million, and it eliminated a number of fees that it was otherwise imposing. The district court, in its decision, simply referred to the CSEA record and really didn't address any of these issues that we applied, and we respectfully submit that at a minimum, these raised questions of fact that should have precluded summary judgment. Thank you. This is Judge Newman. Did those- took those actions at the same time they adjusted the retiree's contribution formula? Correct. We have documentation in our record reflecting that. Thank you, Mr. Riley. Thank you. Ms. Granich? Ms. Granich? I'm sorry. No, we're fine. Perfectly okay. This is Christina Pietro Granich, and I represent the appellant from Council 82. In an effort not to be duplicative, I'm going to try to focus on a very different aspect of our record and our particular facts. First, I just want to mention as a note that Council 82 also had not negotiated a contract in 2011. Our contract, our successor contract, was not negotiating until 2013, and therefore, if there was a breach of contract to be had, it was during that last period when the 2007 to 2009 CBA from Council 82 was held over under Triborough, and those rights under that contract remained in effect. But I'd like to focus the Court's attention specifically to the specific contract language, some of the specific contract language at issue here, which is similar if not exactly the same contract language at issue in all the related actions, which Council 82 asserts is the source of appellant's rights to fix contribution rates for health insurance in retirement. First, what you have is what the parties have been calling the Continuous Coverage Clause set forth in every CBA at issue in this action from 1982 forward and until present day. And this clause states in particular, just to refresh your recollection, that the state shall continue to provide all the forms and extensive coverage as defined by the contracts in force on March 31st, obviously, whatever year applies, with the state's health and dental insurance carriers unless specifically modified or replaced pursuant to this agreement. Now, the lower, the District Court had indicated that this provision was unambiguous and didn't provide any vesting of a fixed premium contribution rate. However, to show this, in particular, the respondents had put in not one, but three, actually four different declarations from witnesses to tell us exactly what that provision meant. And I submit that if you need four declarations to identify what a provision means, then perhaps it's actually ambiguous. But nevertheless, one declaration in particular was from Daryl Decker, the Director of Gore's Employee Benefits Management Unit. And one was from Priscilla Feinberg, who's already been mentioned here today, who had been the head of Gore's Health Benefits Unit. And in particular, both Decker and Feinberg declared that this provision simply meant that continued from one collective bargaining unit to the next, as it was defined in the contracts with the state health insurance carriers, unless modified through negotiated changes. So, at a minimum, they were saying that it provides a baseline of health benefits, unless there was a negotiated change. Okay, no one's arguing that that's not true. But conveniently, both Decker and Feinberg did not address the words, all the forms and extensive coverage as defined by the health insurance contract. Excuse me, you have one minute left. Oh, boy. Okay. So, what does that mean? Essentially, this provision refers you to two different places. One are the health insurance contracts themselves. And the second is to other places in the actual collective bargaining agreement, which then also define coverage. In particular, if you look at the health insurance contracts, which initially, the respondents did not put in on their motion of summary judgment, they only did it on reply when the appellants called them out on it, that they were referring to these contracts as to what they didn't have in them. And what they didn't say, particularly the declaration of David Boland, Director of Employee Benefits, he said these contracts don't have any mention of contribution rates. However, when you go and look in the record, and I can give you a specific record site of those contracts that were eventually put in on the reply of the respondent, those health insurance contracts tell two things. One, that they do apply to retirees. In fact, there's a definition of terms and most of those contracts indicate that the contract specifically apply to both employees and retired employees. Second, they also refer to exhibits that were not put in the record in this case. And those exhibits refer to health, general health insurance information booklets, which if you know from the affidavit or declarational brain symptoms that was put into pass, those general health insurance booklets actually refer to contribution rates and discuss exactly how retirees get their insurance and keep their insurance in retirement. So I would submit that this continuous coverage clause, you have to look outside the contract for information as to exactly what it involves. But you also have to look into the CBAs itself, which also contain the contribution rate clause. In particular, in Council 82 under Article 12, 12.8, it refers to the 90-75 contribution. How do you respond to the state's argument that coverage has a pretty clear meaning in insurance law and in insurance policies? If I buy a health insurance policy, coverage refers to what procedures and they're going to cover under what circumstances and so on. And that's something different than how much I pay for it. I thought that was their basic argument was that this is sort of a pretty clear term. Why is that? What's wrong with that argument? Well, because right in the contract itself, it says it continues all forms and extensive coverage except as modified or replaced below. Right, but that's still about coverage, isn't it? No, but those provisions below refer to contribution rates. So, it is indicating right in the face of the provision itself that coverage includes the contribution rate. If you look at 12.1 of Council 82, the continuous coverage clause, it says this coverage continues unless modified or replaced by terms below. And those terms below are specifically the contribution rate. So, it's clear, at least that much is clear, that they intend the coverage to include contribution rates. Plus, we have no idea what the contracts actually hold in their entirety because the respondents didn't put those contracts in their entirety. Well, I'm sorry, when you say we have no idea, there was discovery that went on for years in this case, right? Yes. And so, if they didn't put in exhibits, well, I guess the record is silent as to what those exhibits say, but didn't you have the opportunity to ask for the contracts, including all their exhibits? Well, and we did, and we got what we got. Well, but okay, you got what you got. Maybe they didn't give you everything you asked for, but there are mechanisms to deal with that. If you thought it was important, you asked the district court to make them give you what they didn't. It was called for a discovery request. I'm just having trouble understanding why we can draw inferences in your favor from non-existent exhibits in the record when everyone had an opportunity to find out what all those documents that were relevant were. Well, your honor, initially, our rights to discovery were cut off at a certain point by the district court. Four months into a discovery schedule that we thought would have continued for about six months longer than it did was immediately terminated, and we were required to finish discovery in a very short period of time and go to motions for summary judgment without making any further motions at all until summary judgment motions were decided. And has any of the parties raised the district court's ruling in that regard as some kind of error on appeal? No, I don't believe anybody has, your honor. We did our discovery that we did get from the state. We didn't leave enough time for us to conclude what we did not get at different points in time. But in short, if you look, you know, these provisions in and of themselves, but on their face, and when you have those ambiguities, it allows you to resort under whatever precedents you're citing, federal or state, to extensive evidence. And once you resort to extensive evidence, there is a ton of evidence in this case, including what happened in 1982, the negotiations that resulted in the Chapter 1983 laws that provided for retirees' returns rates to be fixed in perpetuity. And also, not to mention the negotiation course of conduct of the parties for the next 30 years thereafter, where the state had tried on several occasions unsuccessfully to negotiate different contribution rates and did not achieve that, and then eventually just imposed it by making an amendment to the civil service law, and thus we would argue had impaired our contract in that regard by making that amendment and using that amendment administratively to take away our fixed contribution rates in retirement. I think the record is chock full of extensive evidence, including some of the most important testimony in the case, which comes from the state's witnesses themselves, that going back to 1982, retiree insurance contribution rates were fixed because of an on or after date that had no end. And the testimony of Michael Vellforti, to that extent, and Priscilla Feinberg, which make it clear that those benefits remain in perpetuity unless a change is negotiated. And no change was negotiated here when, obviously, this action was started on behalf of the majority of the union. Thank you. Thank you, Ms. Greenwich. Mr. Schaefer, you have three minutes. Yes. Good afternoon. May it please the court. I'm Lawrence Schaefer. I'm with the Olympus Matthias Wexler Law Firm in Albany, and I am here today representing the New York State Correctional Officers and Police Benevolent Association with Mr. Don Rowe being the lead plaintiff. And I'm not going to reiterate all of the arguments set forth in my supplemental brief. I'll be relying on those, but there is one point I would like to specifically address, and that is the inclusion of the affidavit of Mr. Colafatti and Decker. We believe that these affidavits should have been excluded in the summary judgment process. The defendants served their Rule 26 disclosures on December 6, 2013. They identified in that process 16 potential non-party witnesses. These disclosures were never updated or amended, and the defendants deposed all 16 witnesses during the discovery process. Rule 26 requires that the defendants parties provide information on individuals likely to have discoverable information, and that the disclosing party may use to support its claim or defense. In the present case, these two witnesses were highly relevant and probative with respect to one of the issues more down the line, with respect to the contractual impairment, and specifically Mr. Colafatti with respect to whether there was a legitimate public purpose. His testimony served to bridge the gap between evidence as a layperson with factual evidence, and also as an expert witness with respect to the processes and procedures within the budgeting process. So his testimony within the affidavit, and you can see it in the court's decision with respect to NYSCOPA at pages 9 through 11 of the court's decision, was highly relied upon and highly weighted by the court in determining that there was indeed a fiscal crisis and that this was indeed action that was necessary and reasonable. Excuse me, you have one minute left. Thank you very much. There's one very particular difference between our case and the other cases. The lower court held that the affidavits of these two individuals were proper, and one of the facts was that in the response, the defendant's statement of material facts, plaintiffs admitted to each and every fact established by Mr. Colafatti. That may have for another plaintiff, possibly the CSEA, but not with respect to our case. In the Rule 7 statement, you'll see that paragraphs 66 through 89 specifically address those important statements made by Mr. Colafatti that the court relied on to find that there was a legitimate public purpose and that the action was reasonably and necessary. In our papers, we indicated that there was insufficient knowledge because we did not have the ability to depose Mr. Colafatti or Mr. Decker with respect to these important issues. It wasn't that the these two individuals, because they were never disclosed to us, certainly if they were disclosed as potential witnesses or expert witnesses, as we believe they were, they certainly would have been deposed and or a report would have been demanded. But because of that, these important facts were not challenged with respect to Mr. Colafatti's affidavit. Therefore, uh, because this, these findings were crucial and key to the record, uh, we believe that these should have been excluded and that this was an error. And I see that I'm already over my time limit. Um, if there's no further questions. Thank you, Mr. Schaffer. Thank you very much. Mr. Kershko. Thank you, Your Honor. May it please the court. I'm John Kershko on behalf of the Wayne-Spence Public Employees Federation appellants. We do have express fixed contribution language. That's the 90%, 75% language. And we do have vesting durational language. That's the right to retain your health insurance benefit after retirement. And there's a skip, a steep 10 year service vesting requirement, uh, as well, Your Honor. We also have the, uh, excuse me, Mr. Kershko. This is judge Lynch. I just want to make sure I understand, uh, those things that you just cited are not unique to your contract. Am I right about that? Those are the same clauses that, uh, many of the other unions have been relying on in the argument today. Is that right? That is right, Your Honor. Okay. Just wanted to make sure. Okay. So, um, when the district court read those contract that express contract language, read those terms together, uh, back on earlier motion to dismiss, the district court found that this was written contract language capable of reasonably being interpreted as creating a promise to provide the plaintiffs with fixed contribution vested retirement health insurance. And then that's enough right there to defeat summary judgment and reach the prior effect. But it was error for the district court to then on motion for summary judgment to split those contract terms apart and read them separately in a vacuum, erroneously rejecting the fixed contribution as being silent on duration or vesting, and then rejecting the durational vesting language as silent on a fixed contribution. Okay. Uh, on the note, you have one minute. This is Judge Newman. Um, you say it was error, and I understand, of course, that's your argument. But the fact that the judge, um, saw the matter one way, arguably, at the, this motion to dismiss stage, that doesn't mean that the judge was wrong in what the judge concluded, uh, presumably on reflection at the summary judgment stage. In other words, the issue remains, was the judge right or wrong? Not what she's different than she, whatever she said at the dismissal stage. Well, it's our contention, Your Honor, that, um, it was error to resolve issues on a summary judgment motion. It should have been an exercise in issue spotting rather than issue resolution. And when the court split those two contract terms apart and read them separately, um, that also, it violated the ordinary rules of contract construction, which, you know, dictates that you would read the terms together in the contract. So, uh, it was error on the, uh, standard of review, if you will, Your Honor, on a summary judgment motion, uh, to split those terms apart like that. Yeah, go ahead. Even if you're right, that's the only, the contract law way to read them is together. How does that tell us which way to read them? Maybe neither clause survives the durational limits of the CBA. Well, if you have to, the right to retain something after retirement that, you know, we would argue that that's a lifetime vesting, uh, language right there. Uh, so it does survive, you know, each individual collective bargaining agreement. Uh, and by the time the summary judgment decision came around, you now have the court essentially going in a 180 degree, uh, reversal and saying that this now they're the only reasonable interpretation is that the fixed benefit is governed by general durational clause language at the end of each collective bargaining agreement. Um, so it also, and not only does it elevate general durational clause language over the specific language of the, uh, health insurance durational vesting clause, uh, which is that's not in accord with ordinary rules of violated what the tacit court called the cardinal principle of contract interpretation. And that is reading the contract language together as a whole. Um, so lastly, your honor, uh, the granting of summary judgment was error under the standard of review because the district court engaged in issue determination, not issue spotting and resolve ambiguities and reasonable inferences against the plaintiff. Again, the contract language didn't change between the motion to dismiss and the motion for summary judgment. And the last thing I'll say your honor is on that issue of the word coverage. I will point out that it is in the record that in the 1982, uh, first of all, I'll point out that it doesn't require any express or particular words or language. No magic words have to be used to communicate your intent to vet, uh, health insurance coverage. And that's what this court made an error. The district court made an error in requiring of these parties. And I will just point out that in the 1982, uh, past memorandum of understanding, the party did use the word coverage to include fifth and, uh, fifth state contribution, uh, to include the fifth state contribution. So Mr. Kursko, I'm going to let you sit down, so to speak, but where is that in the record? Okay. The 19, yeah, the 1982 past MOU is that volume five joint appendix one, two, one, three, and that MOU modified the state, uh, six contribution from 100% to 90%, your honor. And the parties refer to this modification of the state contribution as a modification to health insurance coverage. Okay. Thank you. Um, I think that's all we have of you. Very well. Thanks very much, Mr. Kursko. Our next, uh, person up is Ms. Nelson. Uh, good morning. This is Erica Gray Nelson on behalf of the robbers appellant. Um, it is our position that the issues on appeal have been addressed by appellants in the related cases thus far. Therefore, we respectfully declined to repeat the same arguments here. Further, maybe, may we request that any time remaining be reserved for rebuttal or be allocated to the remaining appellants. Thank you. Okay. Thank you very much. Yeah. Yes. It's about you had a minute. No. Yes. You had a minute. So that's fine. We will, I'm sure we will use that up in some fashion during the course of argument. Thank you, your honor. Thank you, Ms. Nelson. Uh, next Mr. Uh, Denigris. Good morning, your honor. May it please the court, Steven G. Denigris on behalf of the police appellant association, the state of New York. I know that you've got, uh, two, two cases in which you're representing clients. Why don't you combine that argument at this point? Your honor, if I may, uh, Mr. Greenberg, who's is one of the other councils on the court. The employees is going to, uh, I'd like to give him my time. I've given him already a minute, but I'd like to give him the other minute because he's going to adequately address, uh, the remaining issues that are common to us and it'll save some time for the court. That will be fine. Thank you very much. The only thing, the only thing I would just like to add as it applies to the state troopers is, uh, I, I wish I was writing faster, but one of the questions that the panel had asked is concerned whether or not the state could give a greater benefit if they chose to. And I would, and I would answer that to, to the court to say that, that all the contracts, especially the troopers contract included is the baseline of what the state, uh, would have obligated to pay. And of course, if they wanted to give us a greater benefit than the baseline, then they certainly could. Um, the other thing I just wanted to raise with the court, it was, it was touched on by my colleague, um, concerned to the Cole Ophedic and Decker affidavits that were put in and not disclosed to us. Uh, Mr. Decker was able to testify or what language meant going back as far as 1982 and 83. And he wasn't even an employee until 1996. And had we, you know, the information that, uh, that he provided and bought the affidavits there really, at least in, in my view, you know, looked like it was expert testimony. And, um, we were really at a hindrance by not having that information. You know, these cases went on for almost five and a half years before the district court finally closed discovery on us. And, uh, I would represent to the court that, uh, you know, we were the oldest case on the docket as it was relayed to us by the court and therefore discovery was going to be cut off in a very, very short period of time. Um, but those are the only two issues that I just wanted to raise to the court to bring to the court's attention on that. Thank you. Anything further? No, your honor. Great. Thank you very much. Um, and Mr. Greenberg. Good morning. Uh, may it please the court. My name is Seth Greenberg. I represent three of the court employee unions. Um, and this, uh, 11 case, uh, argument. I'd like to make two brief points distinct from those already addressed by my colleagues. The first specific to all of the unions representing judicial branch employees, while the court below correctly concluded that the parties collective bargaining agreements guaranteed both active employees and retirees, the contractual right to continued health insurance. It also failed to address the provision of those same agreements that specifically refers to premium contribution levels. Those provisions provide explicitly that quote employees enrolled in such plans shall receive health and prescription drug benefits to the same extent at the same contribution level in the same form and with the same copayment structure that applies to the majority of represented executive branch employees. End quote. The court never addressed whether the parties intended that that language to mean the contribution level that existed at the time of or at any time during the existence of the agreement and during a status quo period. Resolving that ambiguity, a material fact that issue here requires the state summary judgment motion should have been denied in a trial ordered. My second point is applicable to all appellants. That is that the means chosen by the state to accomplish its purported legitimate purpose was unreasonable. A few weeks ago, appellees wrote to the court and cited to this court's decision involving Nassau County's implementation of a wage freeze of its employees as supported of its own prior action. That case, however, is both factually and legally distinguishable for several reasons. There, as in the course 2006 decision of Buffalo Teachers Federation, a control board made the decision only after certain conditions had been met and numerous steps were found to have been taken and most notably, the impairment was only for a limited period of time. In the Nassau case, the contract impairment of the wage freeze was imposed at one-year increments with new analysis and determination made each year. Here, appellee's unilateral contract impairment was of a permanent nature. You have one minute left. Thank you. Here, appellee's unilateral contract impairment was of a permanent nature, not narrowly circumscribed to meet the purported legitimate purpose. Thus, even if you were to accept that there existed a fiscal crisis, as appellees argue, when that abated, so too should have the impairment. Unless the court has any questions, those are the two items I wanted to highlight distinct from those previously addressed. Thank you. Thank you, Mr. Greenberg. And I think with that, and you were covering for Mr., well, you were covering for three unions, including one with Mr. Denegris, right? No, Your Honor. I represent three of the court employee unions, and Mr. Denegris represents one under that same docket number. Yes. Okay. Got it. He represents another court employee union under 183211. Great. Great. Thank you. Anybody for appellants, just so I make sure, since we have 11 of your clients here, anybody for appellants who has not yet argued? I think we called on everyone. Hearing none, Mr. Brody, on behalf of the state of New York. May it please the court, Frederick Brody for appellees. No law does any contracted issue say the state's contribution to retiree health insurance premiums must remain unchanged forever. You can scour each of the 12 records before the court, and you won't find such a provision. Why, then, did the state's premium contribution rates remain the same for 28 years? The answer's simple. In 1983, the rates were written into a statute, civil service law 167.1. In 2011, the legislature amended 167. The amendment allowed civil service and the budget director to change the contribution rates for retirees. Then, to help the state survive a deepening fiscal crisis, the state's contribution toward retiree premiums was modestly reduced by 2%. That change was permitted. Appellants had no vested right to the prior contribution rates. Excuse me, Mr. Brody. This is Judge Lynch. Let me just make sure I understand all the brief. Your brief assumes arguendo that the provision that retirees have a right to retain coverage after retirement does not expire with the expiration of the CBA. I understand you're explicit that you're not conceding that that's true. You just assume it arguendo. I don't understand why you even assume that. Isn't it the clear implication of your argument that it does not? Your Honor, we assume it to get that off the table. I understand why you assume it, but I'm just trying to understand the implications of the argument that you're making, because I don't see anything in anybody's argument that would suggest that there's something about that provision that could escape the Tackett interpretation that you're relying on, or the analysis that you just made about the interrelation of the statutes and the CBAs, that would suggest that that provision could continue beyond the expiration date of the contract. In other words, it says if you retire between now and the expiration of this contract, you have the right to retain coverage until the expiration of this contract. Wouldn't that be the clear implication of your argument? No, it wouldn't. Here's the difference between those two clauses. The continued coverage clause specifically for retirees, which by the way, exists only in four contracts, CSEA past DC-37 and UUP after 2007. But that specific clause... Doesn't that also mean it applies to all the employees? No, it says coverage. So they get the coverage and they get the same contribution rate, but if you change the contribution rate for the executives, then you change the contribution rate to the judicials. But I want to get back to this continued coverage clause for retirees. It says employees have the right to retain health insurance coverage after retirement. Now, what's different about that and the 90-75 clause that actually sets premium contribution rates? For one thing, 90-75 clause doesn't say that you can retain it. It just says the state agrees to pay 90% of the cost of individual coverage. Okay, fair enough. So that may distinguish the coverage clause, but certainly it's also the implication of your contention that the state has no obligation to contribute anything at all to retiree health insurance premiums beyond the date of the contract, right? The CBAs would not prevent a cessation of contributions because they don't vest a contribution rate. Okay, I understand, but the statute does until it changes. Correct. There are other constraints that operate and you have a statute theoretically be amended to provide zero contributions. I think such a drastic proposal almost certainly would not survive the political process and a repeal of all state contributions arguably could defeat other contract rights, so its legal status would be unclear. But the court's decision here would not control that case. The 2% change at issue is not of that caused anyone to lose their coverage. In fact, NYSHIP has continued to run for almost nine years since the 2011 amendment. Now, I want to get, here's what I want to address. First, I'm going to deal with the statute and then I'm going to move to background contract law and then I'm going to discuss the specific clauses at issue. And after that, if I have time, I'm going to get to the on the other issues such as reasonable and necessary. The civil service law set contribution levels, but it didn't vest them. Section 167.1 didn't create contract rights. It just said what percentages the state would pay. The state courts in RPEA and this court in NYSCOA, therefore, held the statute set policy, but did not vest contribution levels. When the legislature wanted the best rights in retirees, it did so expressly. For instance, New York retirement and social security law 612 has a section called vesting that provides for pension vesting. There's no provision. Excuse me, counsel. You can use as much of your time as you want on the statutory point, but I understood the main point of the appellant is the contractual point. The contract, gives them a vested right. I think they even understand the statute can be changed by the legislature. So at some point, you better tell us why the contract doesn't do what they say it does. I will do that now since your honor has expressed interest. First of all, well, let me do this. I want to briefly go over the applicable law because that's important. And you've got federal law and state law. Now I'll get to each contract clause. Each contract before the court contains a general duration clause. No contract makes an exception to the duration clause for premium contribution rates. That means contribution rates did not vest. The Supreme Court held in packet that you cannot infer vested retiree benefits from filers. Well, let me ask you a case law binding case law from the Supreme Court that when we are addressing a question of contractual impairment under the constitution, it becomes ultimately a question of federal law, what the contract, but I think in context, all of those cases are saying in effect, they can't declare big court can't declare something contractual and thereby give it protection under the contract clause. It doesn't necessarily mean that any interpretive device that is used under federal law to interpret federal contracts is the only thing that could be protected under the contract clause, does it? No, you have to find there's a right and the court can use different interpretive tools for doing that. Each state has lots of provisions in its common law or even by statute that fill gaps in different kinds of contracts or provide certain tools or procedures for interpreting contracts that differ from state to state and they differ from what the federal government or the federal courts use in interpreting the narrow set of contracts that are governed by federal common law. But it seems to me that under the Erie Doctrine, so long as the state has in good faith adopted something out of some subterfuge to create constitutional issues, but this is just the way they read their contract and the people who negotiate contracts under state law understand that this is what the state law is. At a minimum, even the cases you're relying on say that we have to give respectful attention to the state court's reading of a contract, but I would submit to you that in the ordinary case, when the state says this is what we understand our contracts, particularly contracts entered into by the state under a state law that is quite distinct from the federal labor laws, that we just disregard that and interpret this the way the federal courts would interpret a federal labor contract? Well, plaintiffs here chose a federal forum and in impairment cases, federal courts must decide for themselves whether there's a contract and what it provides. That's Irving Trust against Day. And in doing that, you're suggesting that we should disregard whatever the New York state law is on how this state law contract that is purely a creature of state law, because only the state law that allows public employees to bargain collectively at all, that we should somehow disregard what the New York courts have to say about how such contracts should be interpreted? I don't think so. I do think that New York law is the same as federal law in fundamental respects. First, the court of appeals held in Colby that contract rights generally don't survive the termination of a CBA. Second, the Colby court also held that whether rights best depends on well-established principles of contract interpretation. Right. And then they also held in Colby that in this case, there was sufficient ambiguity under circumstances that sound an awful like what the Supreme Court has said is silence. And under circumstances that involved this, the very clause about substituting sick leave time for the employee contributions that exists in many of these contracts before us today. Well, I would respectfully disagree with that, because in Colby, the vesting was unambiguous. It said, according to the court of appeals, that coverage continues until the employee reaches age 70. What the parties disagreed over in Colby was the benefit scope, not vesting. It was whether the benefit provided exactly the same coverage or substantially equivalent coverage. And there's another New York case that's important here, Aeneas McDonald, which is cited at pages 76 to 77 of our brief. There, the court of appeals declined to imply from past practice a vesting term that was missing from the CBA. So in New York, just like in Packett, you cannot infer vesting from silence. Now, the only New York decision to consider Packett follows it. In Village of Old Brookville, cited in our 28-J letter, the second department agreed with Packett that vested benefits cannot be inferred from silence and that ambiguous contract clauses cannot create vested rights. Now- Excuse me. It is Judge Newman. Is your point here that the only way the contributory rate survives the expiration date of the CBA is if the contract says that in explicit terms? Is that your point? I think the contract does need to say it. I believe they said, you know, there's a concurrence in Packett that says, well, of course, you can look at other evidence. And we can imagine a clause that, for instance, is badly drafted. So it says something about vesting, but you're not sure what the subject is, what the verb is. So you've got this sentence, it's garbled, and it's ambiguous. So then you would be able to resolve the ambiguity through- So are you saying there at least has to be a clause that concerns the vesting of a contribution right? Correct. It may not be perfect language, but it must cover that topic. Absolutely correct, Your Honor. And- In the absence of any clause that even touches on the issue of the continuation of a contributory rate beyond expiration of the CBA, it cannot vest. Correct. The rate cannot- The entitlement to maintain the rate cannot vest. That's your position. That's absolutely correct, Your Honor. And you cannot infer vesting from silence. That's Packett, that's Reese, and that's also Aeneas McDonald on the state level. And that makes perfect sense. Now, let's see if these clauses to which plaintiffs allude contain any such language. Well, before we go there, I do want to go back to the statute in one respect that's not something that you've addressed in your brief. And that is whether the statute does indeed disavow the enforceability of the contract to whatever extent a court might construe it differently than you do. And here's why I think this is of some significance in the case. Suppose we agreed with the district court about the existence of the emergency and that this was a reasonable response to the emergency. I think you'd agree that would dispose of the federal claim in the case, would it not? Yes. But that leaves us still with the breach of contract clause, a clause of action that the plaintiffs bring over which the district court did assume supplemental jurisdiction. So it seems to me that so far, we have no way of avoiding the interpretation issue that you've been addressing so far about whether there is a breach of contract here. And what I'm wondering is there's something a little peculiar about that structure. The contract clause cases as I understand them, say that it's okay for a state to breach a contract so long as they pay damages, that's not an impairment. And so what I'm wondering is suppose we disagree with you about the meaning of the collective bargaining agreement under state and federal law. You can still win your constitutional claim. But what is your position on does this statute, do you agree that this statute impairs or disavows whatever interpretation, any contrary interpretation of the collective bargaining agreement that a court may ever reach? That the state is in effect saying, we are only going to pay this much money, period, end of story. We don't care what the collective bargaining agreement says. Is that your understanding of what this statute is such that if we were in state court arguing without any reference to the constitution, we were just arguing what the collective bargaining agreement, whether it's a breach of the collective bargaining agreement, the state court would be obliged to conclude there is no remedy. Whatever the contract meant, the state legislature has trumped that agreement. But no, your honor, you can vary the statute by agreement. But my point is there is no agreement saying that contribution sets. But yes, and the case, I think the case in the second circuit that's relevant on your honor's point is called TM Park. And that says that there's a difference between impairment and just a breach. And if they have a remedy on the state level, then it's not impairment. And I would suggest here that plaintiffs rushed to federal court. They didn't go to the court of claims, but they had a remedy that they could have, of which they could have availed themselves. So if your honor wishes to extend that point, I would say that, yes, you can not only affirm because it's reasonable and necessary, but you can also affirm because there's no impairment because they would have had a state court remedy if they had gone to the court of claims. Well, but they only have a state court remedy if they have a contract. Your position is they don't. Right. So we would have to decide what the surely it can't be the case that the TM case means that the plaintiff has no no claim of impairment if it's simply because it didn't raise that claim in state court when it raised it in a federal forum that had supplemental jurisdiction over it. Well, TM Park doesn't address that because they did go to the court of claims in that case. But, you know, all I'm suggesting is that you could find that there's that there is no impairment here. But obviously, that's not the thrust of our brief. The thrust of our brief is these contract clauses. And let me go through them one by one. First, the general continued coverage clause doesn't address premium contribution. It continues the forms and extent of coverage. Coverage and premiums are different things. Premiums are the cost you pay to get coverage. Premiums may increase or decrease while the coverage purchased remains the same. That's what happens whenever your insurance bill goes up. Coverage is the insurance product that's purchased from the state's health insurance carrier. Now, the CBAs themselves make this distinction between coverage and premiums. The executive branch contracts say state would pay 90% of the cost of individual coverage and 75% of the cost of dependent coverage. That's coverage different from premiums. The unremarried spouse clause, also cited by plaintiffs, says spouses may continue coverage at the same contribution rates as active employees. Again, coverage different from contributions. The judicial branch contracts say employees shall receive health benefits, i.e., coverage, at the same contribution level as most executive branch employees. Again, they are different things. Just so I understand how the unremarried widowed spouse clause works. Your position is while you're working, your insurance premiums are paid in the coverage, the contribution rates that are in the CBA. Then you retire. At that point, you have no particular right to any contribution level other than what's in the statute. It's whether to pay anything at all. At the moment, it pays a relatively modest amount less than for active employees. Then you die. Then your surviving husband or wife gets reinstated to the contribution level that the active employees get, which today would be the same as, under your position. The surviving spouse could get a rather better benefit than the actual retiree was getting. Is that right? Depending on how the rates are manipulated, yes. The benefit quote here is continued coverage and with the same contribution rates as required of active employees. If they wanted to fix on contributions as of a particular date, they could have written a rate or a date into that clause. There is no rate or date. It just says whatever contributions are required of active employees. It puts the spouses on parity with the actives on a par, I guess is what I mean. The retiree himself or herself is not on the statute, but they're not contractually on parity. Well, they depend on the statute. There's been a longstanding policy with only one exception since the early 1980s where retirees do get the same contributions as active employees. There has been a longstanding state policy that promotes that. It would be unusual to have a large gap between the two. When your honor alluded to retirees getting less of a contribution than actives, but actually when the active employees went down, the retirees went down as well. Everyone took a 2% cut. Now, let me go to that continued coverage clause specifically for retirees, because that didn't vest the same contribution rate either. Again, this is only four of the CBAs, CSEA, PAC, DC37, and UUP. While we assume for argument's sake that the provision vests a right, that right is coverage, not premium contribution rate. It just says the right to retain health insurance coverage after retirement. The continued coverage clause for retirees also shows that the general continued coverage clause doesn't apply to retirees. All the contracts, every one has a general continued coverage clause. If the general coverage clauses were construed to include retirees, then the four clauses specifically for retirees where the negotiators took the time and made the effort to actually come up with an agreement for retirees, those would be redundant. Third, the 90-75 clause did not vest contribution rates. Again, that clause provides the state agrees to pay 90% of the cost of individual coverage. It's silent as to duration. Under REIS, the general duration clause applies and the contribution rates end with the CBA. Second, the verb in the clause is agrees in the present tense. So that's an agreement, but that agreement can be supplanted by a later agreement. In fact, it is every few years in CBA land. Third, the clause doesn't even reference retirees. Under Tackett and Reese and under Aeneas MacDonald on the state level, you can't imply vesting from silence. And what we have here is a clause that is silent as to the rate that's applied to retirees. And it's not surprising because you've got a statute that governs the situation. Fourth, the unremarried spouse clause. I just want to revisit that briefly. The spouse clause didn't contain an exception to the general duration clause. It didn't specify a particular time for measuring contribution rates. And the language about working 10 years and retiring defined eligibility for coverage. It didn't prevent premium contribution rates from changing. It just said same contribution rates as for active. And those can change. Fifth, the sick leave clause didn't vest DC37 and UUP. It allows retirees to use sick leave to defray, toward defraying the required contribution to the monthly premium during their own lifetime. So it's, again, there's a reference to the required contribution, but it doesn't set a rate or a date. So it means the required contribution, whatever it may happen to be. The lifetime part of the clause just ensures that sick leave credits don't expire. And it also shows the drafters knew how to say lifetime when necessary. And they didn't anywhere say premium contributions would stay the same for retirees' lifetime. And the final clause I want to address is the judicial branch CBAs. The judicial branch clause does not vest contribution levels. Judicial branch employees simply get the same contribution rate as most executive branch employees, whatever that rate may be. The judicial branch clause also contains no exception to the general duration clause. Therefore, under Reese, it doesn't vest rights. Further, the clause doesn't mention retirees. It speaks only to the rights of employees. Under Packett, courts cannot infer vesting from silence. Now, NYSCOA is wrong to argue that its members' contribution rates were fixed when its contract was signed. If NYSCOA or some other union wanted to fix contribution rates, it could have specified, again, a rate or a date. But it didn't. Further, you've got a clause here that speaks in the present tense, that providing the same contribution level that applies, present tense, to the majority of the executive branch employees. So when you read the contract, what do you do? You look to what do a majority of the executives get? What the court unions negotiated for really was parity with the executive branch. But that means when contributions decrease for the executives, the judicials have to take the bitter with the rates that were raised by the plaintiffs. Retiree health benefits are not deferred compensation. Shenango Forks and similar cases cited by plaintiffs treat retiree health insurance like deferred compensation for a limited purpose, making it a subject of collective bargaining. Those cases don't go further and say premium contributions- You're back. You have one minute left. They don't go further, thank you, and say premium contributions vest as a result. For vesting purposes, premium contributions should not be treated as deferred compensation because nothing's deferred from employee paychecks. If a worker says, I don't want retiree health insurance, I disclaim it. Her take-home pay does not increase. It stays at the contract wage. And they're unrelated to the amount of work performed. Retirees receive more contributions depending on how long they're retired, not how long they've worked. And as far as the Taylor Law, the Triborough Amendment, and sunset clauses, those don't vest rights. They simply extend the contract's effectiveness until the parties negotiate a new agreement. Can I interrupt you there, Mr. Bertie, and ask a question about that? We heard from some of those arguing for what, with no disrespect, I'll call the niche unions, ones that have particular sets of issues distinct from the principal issues you've been talking about. We heard from some of them that even putting aside the argument that there is vesting, for at least some of those retirees, they should be entitled to the 90-75 rate for at least a where their pre-existing contracts, their pre-2011 contracts remained in force. Do you have any particular response to that argument? I do. The three unions that make that argument are NYSBEA, PBA-NYS, and Council 82. All three of those unions have contracts that did not contain a continued coverage clause specific to retirees. So these contracts didn't provide retiree health insurance at all. The rights of retirees from those unions stem solely from Section 167, the statute that was amended. Second, the 90-75 clause in those contracts, like the others, did not continue into retirement. Even if they had a retiree-specific coverage clause, still you've got a separate clause that says we're going to contribute 90 and 75, but it doesn't say retirees. It doesn't have an exception to the general duration clause. Okay, I got it. So the basic point you're making is that there was no retiree coverage under these collective bargaining agreements. The collective bargaining agreements did not apply to retirees at all, and they had to depend on the statute. Is that the basic position? Yes. And it's the same thing for the Taylor Law. Yes, under the Taylor Law, health insurance is a what-was-the-bargain. You have to look at the CDA, and when there's silence under New York Law and federal law, you can't infer vesting from silence. Okay, got it. I have one further question. I think it will be my last for you, and it goes to the constitutional question. One of the arguments that Mr. Green and others emphasized goes to whether, of course, to reach this argument, we'd have to first conclude that there was a contract contrary to what you're saying. I understand that. But then if there was, the question of impairment comes up, and you've got a number of arguments there and arguments that it's not substantial. Then there's a question of is there an emergency? Let's suppose we get past that and we say, yes, there was an emergency. One of the arguments that was made is this was not a reasonable response to the emergency because it was a permanent cut in benefits, not one that lasted for the duration of the fiscal crisis. Now, I understand that we may have another even more dramatic fiscal crisis on the horizon for New York and many other states, given the current state of the economy and the reason why we're all on the telephone at the moment. But in the interim, there are lean years and fat years, and there were fat years in between the time of this emergency and now. So if we reach the pure constitutional question of was this a reasonable response to an emergency, what is your response to the argument that even if the cut was fair at the time it was made for the duration of a particular fiscal crisis, why is it reasonable for it to continue indefinitely? Because keep in mind, 2011, we're in the third year of the fiscal crisis. They had a $17.9 billion gap in 2009 that they bridged. They had a $9.2 billion gap in 2010 that they bridged. But they had another $10 billion gap in 2011. Why was that? It was because they were robbing Peter to pay Paul, essentially, in 2009 and 2010. What they were doing is they were doing one-time cuts, and then with those one-time cuts, they were funding recurring expenses, such as premium contributions. In order to get the state on a sound fiscal footing, what was needed to be done was to cut recurring expenses. And because it was the use of one-time savings to pay recurring expenses in 2009 and 2010 that contributed to the projected deficits in future years. And you can find that at the NSBEA Joint Appendix at page 1507. So that's why they had to focus on where are our recurring expenditures that can be reduced. Otherwise, you're in this continued cannibalism scenario where you're making one-time cuts to pay ongoing expenses. So that's why it was reasonable to cut a recurring expense. I believe I'm over my time, unless the court has further questions. Well, I am going to extend you. I know it's a long morning, but there are a lot of things going on in this case. I do have three questions. I hope they can be asked and even answered briefly. First, if we determine that something about the contract needs consideration by the New York Court of Appeals, what's your position on whether we should certify or whether we should undertake to construe it ourselves? I hope I'm not having my cake and eating it too by giving this answer. But if the court determines that state law would differ from federal law in a way that's disadvantageous to the state. In other words, we know what federal law says. We know there's no vesting under federal law. But state law, well, there may be vesting. Then I would urge the court to certify it to the New York Court of Appeals. But if the court agrees with us that state law and federal law fundamentally are the same and the latest indication in that second department case we cited and the older indication from the Court of Appeals and Aeneas McDonald is that the result would be the same, then there's no need to certify. That's my position. I appreciate how you delicately and maybe even tactfully have put it. But wouldn't it be up to the state court to tell us whether their law is the same as ours? I appreciate we could make that decision if we undertook to construe state or to interpret state law. But if the state view, before we even ask them, if their view is or would be that state law is different, then isn't it up to the state court to tell us that? If we tell them it's the same, then we've construed state law. Isn't that so? Well, you don't certify for every case where there's pending jurisdiction. I agree. That's why I'm simply asking what your view is. And your answer was you should certify only if you think it's different. But we would think it's different if you've already made a decision about state law. Well, if you make a decision about state law, other than the one we urge, that is that state law and federal law are essentially the same, do you think, well, state law may be different? I'm not saying you have to come to a final decision. It's a two-step proposition. You're suggesting if we think state law is the same as ours, we look into state law and think it's the same as ours, we should go ahead without certification. But if we put our toe in the state law pond and think it's different, then we should ask New York, what is the difference? That's correct. Well, maybe Mr. Brody says not to look like you're having your cake and eating too. Isn't the position really that if the state law is clear one way or the other, we don't need to refer it? If it's clear that the state law is different, then we apply the state law and give it whatever weight we're supposed to give it in deciding particular legal questions. If we think it's clear that it's the same, that simplifies our life. But if we think there's some ambiguity, that's when we would certify to the New York court. That's right. I think you're going to come to one of two conclusions. The court's going to either find the way we urge that state law equals federal law, or you're going to find that there's ambiguity. Because I don't think you can find under state law, particularly not with Aeneas McDonald out there and not with the very latest case from the second department out there, that the state would not adopt Packett and Reese. Well, there's no basis in state law to say that the New York court of appeals would apply the yard man presumption, for example. It clearly does not. But that doesn't necessarily mean that it would follow all of the implications of Packett and Reese, and that's one of the things we'd have to look at. Well, I think it would follow the but to the extent the court thinks that there is some ambiguity or some complication, it may be a wise course to certify to the New York court of appeals, and I would not object. Okay. You finished that response? I don't want to cut you off. My next to last question is, what do you understand would be the remedy if the plaintiffs win this appeal? Well, they've asked for damages and injunctive relief, so you would have to go back, and I believe the number in the record is $30 million a year, so you'd have to go back and force the state to pay northward of $200 million over to the retirees to account for this 2% reduction that's gone on for the last nine years, and then there would be injunctive relief going forward. So it would be a very drastic remedy that I would urge the court to consider carefully before imposing. All right. The damage remedy would be a providing of the total amount by which the rate was altered, a consequence of altering. That's right. Okay. Mr. Sprague, did you mean to say that's only the remedy if we decide that the district court erred in not granting summary judgment for the fair? I was asking a total victory. I'm sorry. I'm sorry. You said, I think the words were, if you lose, and I got panicked, but you're absolutely right. I take all that back. The remedy is a remand for further proceedings. Right. No, you took what really was the implication of my question. What does total victory mean? And that's what you answered. Total victory means the state coming up with a large amount of money in the vicinity of $200 million. And that leads very conveniently to my third question, which is simply this, since there is a large amount of money involved in this case, if it's an all or nothing outcome, has this case been considered at a mediation conference before our CAMP program? The CAMP program, no, there hasn't. There are many logistical hurdles that we had to overcome in this case, and there was no CAMP conference. Well, what I'm wondering is, with a large amount of money that is at stake and the fact that, as you heard, the panel has at least raised with both sides a series of concerns. I'm just wondering if it wouldn't be appropriate for the parties to arrange a conference with CAMP so that this case is not decided on an all or nothing basis, or even a remand basis? Well, I would have to ask my clients. Well, of course, I don't expect you to buy into that at the moment, but I just invite all sides to consider that because there certainly are some reasons to think this ought not to be an all or nothing outcome in the interest of all sides. Well, I mean, again, Your Honor, with respect to all or nothing, we're talking a very modest reduction. We're talking 2%. And it was $10.50 for individuals per month and $28.50 for family coverage per month. And I know UUP has put in their reply brief that the numbers are different. If you look at the page they cite, page 710 of their joint appendix, it doesn't say that. It just gives the post-change numbers. I don't know where their numbers come from, but the correct numbers are the ones on page 1496 of the CSEA joint appendix. That might be at least a plausible and perhaps persuasive argument to make to a mediator. I invite you to consider the possibility that it's not a sufficient reason not to even have a mediation conference. No, I'm not going one way or another on mediation, but I am saying, when Your Honor says all or nothing, back in 2011, they considered cuts of 3% to 10% in state contributions. And they settled on 2%. And that was part of the careful crafting and narrow tailoring of the impairment, if there was an impairment. This goes to the last point of reasonable and necessary. They could have done much more. They did a minimal amount, but it turned out to be very important in helping the state make its budget. I take it also there are political safeguards, as it were, with respect to what the legislature is likely to do in a confrontation with public employee unions. Well, that's right. The unions are an important constituency. And their views are heard. I take it the parties could advise us one way or the other whether there will be, in the near future, a conference before our camp people. I can take it back to my clients and ask them. No, I just mean advise us whether they will. I'm not saying you have to go there. That's not our role to force you there. But I'm just inviting you to tell us, both sides, to tell us whether, after due consideration, there will be a camp conference before we plow into the resolution of this case. Certainly. So, this is Judge Hall. Let me ask you, with respect to what Judge Newman and you were just discussing, and then I'll ask the other parties, as well, to ring in after Mr. Brody is finished, but if you were going to consider this rough time, Mr. Brody, for getting back to us, two weeks? Two weeks would be fine. I can send an email out to our clients for a response. Great. And I guess, while I have all of you, or while we have all of you, the rest of you, on the phone, any objection to trying to reach some determination within two weeks and reporting back to us? I'm sorry, Judge. This is Eric Wilke. No, there's no objection with us looking to see if we can move forward to a camp conference and getting back to you within two weeks. That would be great. And anybody else? Is that problematic for anybody else? Okay. Two weeks it is. Thank you. And we have some... Mr. Brody, you're finished, correct? Or not finished. I don't mean it that way, but... Well, I'll just conclude by thanking the court for the time and effort that your honors and the court staff over a period of months have invested in these cases. And we urge deferments because the contract clause appellants seek to enforce just is not there. Thank you very much. And now we have some rebuttal. Mr. Wilke, you are up. Yes, your honors. Thank you. I just want to briefly say that I do think that the state law breach of contract would be something that needs to be decided first. I think that under Colby, the language here at the very least is ambiguous. I think that... I'm sorry, I don't remember which one of your honors specifically, but the unremarried spouse language that has been in the collective bargaining agreements since the late 70s, and that does currently provide a better benefit to the dependent widow or spouse and children rather than a retiree. If you look at the declaration of CSCA's chief negotiator from 1989 to 2016, Ross Hanna, in joint appendix 1127, he actually... I don't believe that this the unremarried spouse is still paying 10% for individual coverage and dependent care coverage is still 25%. It was never increased. You have one minute left. Thank you so much. So I don't think that given that as well, that that does create an ambiguity. I don't think Colby would require as stringent an interpretation of the contract language as TACCET may. And with that, if there are any additional questions of the court, I'd be happy to answer them. Otherwise, we rest. Ms. Hall? Hello? Yes. Ms. Hall, can you hear me? Yes. Yes. I'm sorry. I was talking and I was on mute, thinking that Mr. Walsh might be on mute. Sorry, Mr. Walsh. Mr. Walsh, you have reserved a minute for rebuttal. Yes. Thank you very much, Judge. A couple of things. The states asserted that NYSBIA had no CBA, yet they acknowledged and admitted in the record below that there was an existing contract as to the premium contributions. So if there's a contract for the contributions, there must be coverage. As to the issue of whether there's an ambiguity in the contract, that's the issue on which the court below said there was no ambiguity. We should look to the practice of the parties, the practice in the industry. And the industry practice is set forth by Michael Forte. And I will say that right here. These are the questions and answers. So the proposal was to last into perpetuity. Yes. Does it say that in the proposal? No. But that was the state's intent. Yes. But the state intended it. The state intended it because we didn't communicate a sunset date. That distinguishes this case 100% from tactic. Because that is the practice of these parties when they negotiate a collective bargaining agreement. As to the old Brookville case, the old Brookville case, no union was heard in that case. That case was between two employers fighting about whether one of them had to pay. And as to the idea that the Taylor Law provision that the contract terms continue until a new clause is negotiated, the state is arguing that this one clause on retiree premium contributions is the one clause that doesn't extend. But the contract doesn't say that. And state law says that it does. Thank you. Thank you. Thank you, Mr. Walsh. Ms. Greenwich. Yes. Thank you, Your Honor. I would just like to briefly mention that as much as the state would like to continue to say that our contracts are silent, I think all the unions are in agreement that our contracts are anything but silent on the issue of continued health insurance retirement as well as a fixed contribution rate in retirement. Our contracts are ambiguous in this regard. And I would just briefly like to point the court's attention to cases such as Evans versus Deposit Central School District, which stated specifically, this is a case brought up by the Attorney General in his letter. And it says specifically, if extrinsic evidence shows that it was the defendant's intent to vest rights under a contract or shows that there was an established precedent of such practice, rights are considered vested. And I would submit that this record is full of extrinsic evidence that the state would like to divorce itself entirely from 1982 and what happened there. And then they'd like to divorce themselves entirely from their course of negotiating over the next 30 years. And they simply can't do that here. What happened in 1982 was not a side deal, as the district court referred to. It was an outright negotiations between the state and every union that's involved here in this related litigation. We all know what happened there. We agreed to protect our pre-1983 retirees in exchange for giving back, you know, having a worse rate contribution rate for employees for health insurance, active as well as prospective future retirees. The on or after date was 1983 and thereafter. We all know what happened there. And the state would like to pretend it didn't happen and flash forward to 2011 and say that it was reasonable to take money from the one group of people who probably shouldn't have money taken from people who are on income, some of them since 1983 and 84 when they retired. So 2% may not seem a lot to certain people, but if you're on a fixed income or haven't worked since the 80s or the 90s, 2% can amount to quite a bit of money. And I would just respectfully like to point the court to everything that's in this record, including the fact that the continuous contracts that issue the health insurance contracts, those contracts cover retiree health care. And those contracts were not submitted in their entirety. And I would submit that what the state did not submit to us on their motion for summary judgment were documents that showed that contribution rates were part of those contracts and information given to employees when they do enter retiree health, you know, are entitled to get their entire health care. And I just want to specifically refer the court. I'm just going to say them quickly, because I've written them down, but our county to appendix pages 1505 1532 1765 1791 1835 1856 1881 1968 1972. And also 1411 to 1412 was distinguished show that those contracts that the state refers to in the coverage clause refer to retiree health care, one of the forms and extent of health care is retiree health care. And that when you have to look to fill in the terms of what you pay for that health care, you have two places either contracts themselves with a mental health insurance booklet would have done or you refer to the CBA itself. And then for cancellation to its section 12.a and b. And there's no reference to whether it's employees or retirees, specifically because it applies to both where the court wanted to make a distinction, especially for, let's say, unmarried spouses, the court made that wasn't necessary to make a distinction for 12 a and b, because everyone knew that was part of the coverage that was to continue in perpetuity. Thank you, Your Honor, for your time. And I have to say, the fact that you are very knowledgeable about this record gives us great heart. Thank you, Miss Greenwich. Thank you all will reserve decision in this case. And this case being the final one and only case or set of cases on the docket for argument this I will ask the clerk please to adjourn court. Course sense adjourned.